The final case on our calendar for argument this morning is United States v. Razzouk, No. 18-1395. Thank you. Thank you. I'm ready to proceed, Your Honor. Morning. My name is Steve Zissou. It's my privilege today to appear for the appellant, Sassine Razzouk. I was not counsel at all times below. I entered the case sometime in 2016, August of 2016, after the government filed their breach letter alleging that Mr. Razzouk had breached the cooperation agreement. That's point two. I'm going to go in order. I'll start with point one, which is the Court's failure to conduct a proper inquiry pursuant to Rule 11, a case that — or an issue, I think, that has some resonance with Judge Carney, because Your Honor authored the opinion in United States v. Lloyd, finding similar errors here to be a significant failure, the failure to establish a factual basis, the failure to properly establish all the elements of the offenses. The difference between the Court's unwillingness to give Mr. Lloyd relief was that Lloyd had not objected before the entry of the judgment and had a waiver of appeal in his agreement. What was wrong with the plea?  I — on the basis of the plea, he appeared to admit the bribe. I received these payments in part with the intent to influence with respect to awarding jobs to Riddell in excess of $5,000. I know you point to a subsequent part of the plea that you say suggests some question about what the things were that he was receiving, but he said he was receiving payments. Well, but the — what I think it doesn't establish is what the Court didn't ask him to concede or to acknowledge was that there was any kind of quid pro quo. And I don't think the language that Your Honor read — frankly, Judge, if you had been more detailed, you would have read through the indictment, you would have asked him to acknowledge the factual basis of the plea. None of that was present here, nor, Your Honor, was it a surprise that prior to the entry of judgment, this issue was raised. Let me back up for a little bit. So when I first take over the case, the first thing I do is contact the attorney for the government and to confirm that despite the allegations of breach, they are going to stand by the commitment in the plea agreement that they're going to recommend three points for acceptance of responsibility, and the same commitment they made to the Probation Department that they're going to recommend acceptance points. Not only that, there's a concession that although there won't be a 5K letter here, we are going to clearly explain to the Court that Mr. Razzoup provided substantial assistance to the government. Two, three people were arrested. Other cases were brought on. He did what he was supposed to do. So — Up to a point. I beg your pardon? To a point, he did what he was supposed to do. He was supposed to meet with the other fellow, Quinbao, and he wasn't supposed to be talking to Quinbao about the possibility of Quinbao's lying, or his change testimony. Clearly, he wasn't, but the — you know, the government's failure here is standing by that portion of the plea agreement that required them to — to recommend acceptance — to go along with acceptance. So if a person enters into a plea agreement and cooperates for a period of time, he gets credit, full credit for that, notwithstanding the fact that he then breaches the agreement later on. I would have thought that wouldn't fly. I mean, that once you breach, that's the end of it. The government's not — not required to do anything further. Well, I respectfully disagree with the Court. I think that you can have both. You can have acceptance of responsibility where the parties disagree with whether or not there is a breach on some other ground. In this particular case — What happens to the standard of when a cooperator breaches the plea agreement, the government tears it up? Well, tearing it up and taking the position that he has earned acceptance points are two entirely different things. They did. They tore up those portions of it that bound them, but for the rest of the plea agreement, they consistently held that it was useful. And that's what the agreement provided for, that it said in paragraph 8 that the government would be relieved of certain obligations if he failed to fulfill his own obligations under certain aspects of the agreement, but that would not give him grounds to withdraw the plea. It was provided, right? Except that post that conduct, the attorney for the government confirmed that they nevertheless would not oppose acceptance of responsibility points. Are they bound by that? I beg your pardon? Are they bound by that? I believe that. Was there a merger clause in this agreement? Look, I — I think there was a merger clause in this agreement, right? I think — judge, again, with all due respect, I disagree. There has to be some — the probation court made it unequivocally clear that the government was going to go along with that, Mr. Razzucano. But he's taking a position totally different from the one that he — that was the basis for his plea. He's now saying that these payments were not bribes. They were payments for activities elsewhere, abroad and so forth, taking a totally different position. So how is that accepting responsibility for his conduct? He accepted responsibility for what he did, and that is — and we made this clear in our — in our objection letter, that what this allocution was, and that's where I'm getting back to this, and what he did was accept unlawful gratuities, a lesser offense of program bribery under 666 of Title 18. And that's what — that's what we made clear on. Sorry, could you say that again? I'm still having trouble understanding why you argue there is not a factual basis for the plea when he said during this period he accepted United States currency from Rudell in part with the intent to influence with respect to awarding jobs to Rudell in excess of $5,000. I provided benefit in return. I accepted payments. Or things I was not entitled to. Judge, I — maybe it's just me. If there's an — I don't see that being anything but ambiguous. And, Judge Kohl, principles of lenity would make it clear. If there's some ambiguity, at the very least, the Court should have conducted a further inquiry as to what the factual basis of the plea was. You think there's ambiguity, but I think there's — isn't there a basis for the judge to sort of accept that at that point? You know, and — and I mean, it's not as though there was — it was totally ambiguous. He's basically admitting to the elements of the offense. I think it was totally ambiguous, but the key is we're imagining a world where it's after sentencing and this is raised for the first time. That's not what just happened. But at that point, Rule 11 requires the Court to inquire further. Let's be clear. At the sentencing hearing, I called Mr. Rizuk as a witness. The Court had every opportunity to ask him about the guilty plea that he entered and what his understanding was. The attorney for the government had every opportunity to do that. One of the arguments you — you make is that the defendant was denied a proper Fatico hearing. Right. And I couldn't figure out what the Fatico hearing was supposed to be. The defendant was called. He was permitted to testify about anything he wanted. What was it that there was supposed to be a Fatico hearing about? Well, calling the defendant to testify about 3553A factors is different from putting the government to their proof, which is — About what? About loss, about restitution, about all — I mean, we virtually objected to everything. Sure. There were lots of submissions to the Court prior to the sentencing hearing on issues such as restitution. But — and the defendant was permitted to testify, of course, at the sentencing hearing. What was he prevented from testifying about? Again, Mr. Rizuk, I think you're shifting the burden of proof. To prove loss and to prove aggregating — aggregating guideline factors, the government bears the burden of proof. It's happened enough — They had put in all of the KPMG audit and the Grassi audit. And so you get to sentencing and you say you were denied a proper Fatico hearing. And my question is really a simple one. A Fatico hearing for what? To establish what? So that the government could establish loss. Remember, Judge Cudle, our position was Connison suffered no loss. No, but wait a moment. You — you enter the sentencing hearing. There have been all of these prior submissions, including the KPMG audit and the Grassi audit, and the government says, okay, you have all of our submissions. And the defendant says, I want a — I want a Fatico hearing. The judge says, go ahead, testify. Do what you — That's — Judge Moser, that's not how it works. If the Court's ordering a Fatico hearing, first of all, you know about it ahead of time, and secondly, you establish what the — what the issues are. And if the Court, if Your Honor had a concern about whether or not there was a need to call witnesses, you would have — you would have asked the attorney for the government. It's not enough to say, call whoever you want in a flippant way, which is the way this was addressed. That's not how sentencing hearings are — should be conducted. It's not as though there was a blank slate, though, going into that moment. As Judge Kotal has pointed out, the government had put in its proof. The government had already put in everything about — that it — it supported everything it wanted to argue about, the forfeitures and restitution and so forth. And as set forth in our memorandum and in the — and in our appendix, we pointed out simply 10 sample jobs that — that the KPMG analysis relied on, right? And it was — it was — Judge Kotal, you're shaking your head. It was 20 — You did that. But it was up to you to try and — and offset what the government had put in. And that's — that was the posture at the point that your client was testifying. But that — again, I'm most — The government had already met its burden. Your responsibility at that point was to respond, right? No. I did respond, and we made it unequivocally clear that the KPMG analysis was fatally flawed. That's all I need to do. I don't have to prove any more than that than to raise a question as to whether or not the Court should be relying on the government's submission. And that's what the difference is here. And to simply, again, flippantly say, well, call whoever you want to, that's not how the Judges in this district conduct FATICO hearings. You know ahead of time what's going to happen. You understand what issues you need to address. Instead, there was radio silence.  The sentencing date was coming up, and there had been all of these submissions before. Was there some request for a FATICO hearing on a specific issue? Yes. On every objection we raised, including loss, including everything you could possibly imagine in our objection letter. Indeed, beyond that, I would constantly email the deputy. Can we appear? Can we just get some idea what it is we're appearing for? What it is? What issues we should be prepared to address? Again, it's radio silence. You show up, there's issues, and the Court starts reading from a prepared opinion. Most respectfully, that's just not how it should be working in a case with these many issues. Judge McCarney, I suspect you're going to tell me I've run overboard. That's correct. Thank you. You have several minutes for rebuttal. We'll hear from the government. Good morning, Your Honors. May it please the Court. My name is Turner Buford, and I represent the United States in this appeal. I also represented the United States in some of the post-sentencing proceedings relating to bail on appeal, but I was not the lead attorney for the bulk of the case. Your Honors, just to respond briefly to some of the points that were made with respect to the allegation that the government did not keep up its end of the bargain under the plea agreement with respect to communicating the defendant's cooperation to the district court. As Judge Ross, I think, acknowledged at the moment when the defendant breached the cooperation agreement, the government was absolved of that obligation by virtue of the material breached by the defendant. Nevertheless, the government did provide information to Judge Ross about the information the defendant had given, which did, in fact, lead to the successful prosecution of two other defendants, which is noted in a footnote to our brief to the Court, and Judge Ross acknowledges that at the appendix at page 186, that she was aware of the assistance the defendant did provide. So that was taken into account at the sentencing. With respect to— The government actually made representations that the breach would be excused and the government would go forward and argue for the adjustment. With respect to acceptance points, Your Honor? Uh-huh. I recognize from the probation report that the government did make that representation, but I think what happened after that representation was the defendant began making the arguments about the sufficiency of the plea, in effect arguing that he never accepted bribes, and testifying at the sentencing hearing that the payments that he did receive were for unrelated overseas work. At that point, I think the government did no more than simply acknowledge the defendant's own position, which was that he was not guilty, essentially, of the crime to which he had pleaded guilty to. Judge Ross acknowledges this tension, I think, during the sentencing hearing, where she says the defendant arrives today, on the one hand, arguing there's insufficient factual basis for the plea because he didn't commit the crime that he pled guilty to, and on the other hand, asking this Court in sentencing him to give him three points for taking full responsibility for his actions. I think the government was justified in modifying the representation that had been made in light of the arguments the defendant had elected to make. So, in a way, there was a cooperation agreement. That was breached.  More representations. Those were breached. Government's relieved. I think that's right, Your Honor. I would also, trying to be reasonable and fair, as I think the government was here, but if you wanted to, I think technically, even that representation the government made wouldn't bind it in light of the language in the plea agreement that the material breach absolves the government of its obligations. But certainly, we would have abided, I think, by the representation had the defendant not taken the positions that he did during the sentencing. And the breaches here were disclosing by inference, if not more explicitly, his cooperation with the government, failure to fully cooperate, and maybe attempted crimes. I think at a minimum, Your Honor, it would be the former, which is disclosure of the existence of the cooperation to somebody without the government's approval. That's a breach on its face. And then, our view of the transcript of the recorded meeting between the defendant and Mr. Kianbao is that there's no way to read it other than the defendant was, in effect, offering to perjure himself to ruin the government's case against Mr. Kianbao, which I think would be, it's hard to imagine a more significant breach of the cooperation agreement than that. So we have to remand for the Lagos point, right? I believe that's right, Your Honor. I know in our brief, and this is a point I wanted to make, we suggest that in light of the statement of reasons for restitution, the court might be able to affirm on the record, assuming it agrees, that investigative costs at the invitation or request of the government, the question left open by Lagos, are possible. But I think . . . We don't know that. We don't know that. And I think in preparing for today, we noticed in Judge Ross's July 25, 2018, order where she denied the requested stay of the financial penalties pending appeal, and this is docket number 117 in the district court, she has a footnote in which she says, in her view, it's not clear to her that the record as it exists would justify affirming under Lagos, which was decided after the sentencing. So in light of that, we would respectfully retract our suggestion that this court could affirm on the existing record. I think there's no, from our perspective, no choice but to remand to have Judge Ross consider that question in the first instance. With the Court's permission, I do want to address one of the restitution arguments made, which is that the restitution here is not covered by the MVRA because the offense to which the defendant pleaded guilty to is not an offense against property committed by fraud or deceit. We think that this circuit has not yet addressed specifically, explicitly, what crimes would qualify under that standard, but we think the Court's other . . . this Court did in the Finazzo case assume, without deciding, that a travel act violation based on underlying crime of State bribery would be enough to qualify under the MVRA. In other words, it doesn't have to be an element of the offense as long as it entails some sort of deceit. We think that's right, Your Honor. If the crime, as a matter of fact, involves fraud or deceit, and I think this is a question that would . . . It would seem to me that kickbacks just generally are, in effect, defrauding the company that the person receiving the kickbacks belongs to, because it's the price has been inflated in order to accommodate the kickback, and that's without the company knowing about it. I think that's right, Your Honor. I don't know that this Court has to go quite so far as to say that a kickback or bribery offense would always satisfy the MVRA. I think it might be enough to say that it would do so in this case where the crime was committed by fraud or deceit, and Judge Ross explicitly made that finding as part of her. The low bids that were made, there was — my understanding is that the low bids were generally followed by later adjustments to raise the cost, and that that was part of the scheme. Yes, Your Honor. I think the clear purpose of the scheme, as pled to by the defendant and explained in his proffers, was he would advise Mr. Kionbao and his company to bid low for particular Con Ed projects with the understanding that the defendant would take care of them on the back end by looking the other way, essentially, as Mr. Kionbao and his company overcharged Con Ed. And that's the — the overcharges are what was documented. The overcharges were always in connection — were in connection with cases — with particular bids that — as to which a bribe had been made. That's correct, Your Honor. So what KPMG and their work was later double-checked by Grassi, the other accountant firm, did was examine all of the purchase orders and the underlying administrative releases, I think, in connection with the payments that Con Ed had made to Mr. Kionbao. And what they did first was look for an overcharge or double payment or payment for work that wasn't done. And if they found such a charge, they then looked at the payments from Mr. Kionbao to the defendant to see if there was a check that had in the memo line a specific reference to the project that was being administered. And if they found both, the overcharge and the corresponding check, they counted that as a loss to Con Ed as a result of the scheme. And I think that's a — that's a — a sound methodology that would provide a of upholding the restitution order. And finally, I think just with respect to the — to the Fatico hearing, I don't believe the record indicates the defendant explicitly asking for it. Certainly Judge Ross gave the defendant ample latitude at the hearing to call whatever witnesses the defendant wanted to. As far as the government's aware, the defendant made no efforts to have available witnesses from either KPMG or GRASI or Con Ed that the defendant wanted to call that would introduce evidence. And the defendant in the reply brief says that he's uniquely positioned to opine on the inner workings of Con Ed's bidding process and how it awards contracts and makes payments. And yet those topics are not covered in the defendant's own testimony at the Fatico hearing. So I think the idea that Judge Ross somehow shut off argument or the introduction of evidence with respect to the sentencing amount is not supported by the record. And apart from that, unless the Court has questions, we'll rest on our submission. Thank you. Thank you. Mr. Zissou, you have two minutes. Thank you, Judge. So just a — just a couple of things, if I may. First of all, when they say they explained to the Court that he provided substantial assistance, it's just not accurate to say. They minimized the substantial assistance that he provided routinely and at the sentence. And so Judge Ross essentially discounted it. The other issue, Judge Walker, that I think you should be clear on is all they did, all KPMG did was take one of these checks that Rudell issued with a job number on it and accounted the loss to Mr. Razzouk. This was so even in cases where there were jobs that Mr. Razzouk's unit had nothing to do with. So let's assume you accept this low-bid scheme. It — frankly, Judge, it's preposterous. As we set forth in our memorandums, Con Ed's internal review system prohibits that from happening. In our — in our supplemental appendix, we outlined to you some of the interviews that were conducted with Con Ed employees. All of the employees are right there. They support Mr. Razzouk's version of events in that it is impossible, based on their structure, unless everyone in the chain of command, up until the CEO, is involved in some sort of a criminal act. And that was never the government's position here. So there was no — Sotomayor, if the overall cost of the particular bid or project being bid on is X and the original bid is a lesser amount, it doesn't matter who approved or how it was approved to get to the — to get to X. If they understood initially that the original bid was coming in low, then there would be an upward adjustment whether or not Razzouk was involved. Except that wasn't the case. I know that's what the government's theory of the case, but there is simply no proof of that. Mr. Razzouk had consistently said otherwise, that whatever he did at best, it had nothing to do with low bids, high bids. Roudel happened to be a very competent contractor. We put that in a memorandum. The — our appendix makes it clear that other units at Con Ed use them. And again, these are units that have nothing to do with Con Ed. KPMG even included in their loss analysis mistakes by Con Ed's bookkeeping department where they wrote the wrong check or paid for your job twice. That was included as a loss to Mr. Razzouk, not simply jobs that were within his own section. That in and of itself had a chain of command. All the way up the chain there are purchase release orders and — So what difference does it make when there's a second accounting firm representing the insurance company, which is going to be on the hook, does their own audit and comes up with a slightly lower amount, but that slightly lower amount is the one that the district court took? Well, and the reason — So two accounting firms both were essentially wrong in their methodology. Yes. That is correct. That is absolutely correct, Judge, because they didn't understand the process and all they did was if there was a memo line in a check, they included that as a loss to Mr. Razzouk, even though — even on jobs that had nothing whatsoever to do with it. May I just address one other point, Judge? I have one more minute. I beg your pardon. Thank you, Judge. On — on — I think it was one of the questions you asked, what was the Fatico hearing. One of our last points was the — was the tax restitution issue, and that is, back in — when Mr. Razzouk was cooperating, he filed these tax returns, the attorney for the government was notified, they were filed with the IRS, they outlined everything that they were doing and why they were not claiming the forfeited funds as income, and then on the EVA sentencing, the attorney for the government says, well, that's not right, and the court went along with it. That — that is plain and simple forfeiture. It's the kind of thing the court should have ordered a hearing on. It's not something that she should have just accepted. And that's simply not the only one, but thank you. Thank you very much. Well argued. We'll take the matter under advisement. We have one more matter on the calendar for today. That's Harry Prasad v. Master Holdings, No. 183623, and we'll take that under advisement as well. The clerk will please adjourn court. Court is adjourned.